## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **RICHARD ALEXANDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-0767 (ESH)** |
| | ) | |
| **KENNETH Y. TOMLINSON,** | ) | |
| **Chairman, Broadcasting Board of** | ) | |
| **Governors,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Richard Alexander has sued the Chairman of the Broadcasting Board of Governors ("BBG"), alleging that the BBG discriminated against him on the basis of race, age, and disability; retaliated against him for filing an EEO complaint; and subjected him to a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17; 42 U.S.C. § 1981; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634; and Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791. Defendant has filed a motion for summary judgment, which, for the reasons explained herein, will be granted.

## BACKGROUND

Plaintiff's employment with BBG began in 1985, when he was hired as a GS-11 broadcast technician for Radio Martí in BBG's Office of Cuba Broadcasting ("OCB"). (Pl.'s Ex. 1 ["Pl.'s Dep."] at 13-15.) In 1992, plaintiff, who is African-American, was promoted to the position of supervisory broadcast technician at the GS-12 level. (*Id.* at 15.)

In April 1996, legislation was passed mandating that OCB be relocated from Washington, D.C. to Miami, Florida.  Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, 1343 (1996).  (*See also* Def.'s Statement of Material Facts Not in Genuine Dispute ["Def.'s Statement"] ¶ 3.)  Thereafter, the employees' union entered into negotiations with the BBG concerning the move, resulting in an agreement between the parties concerning the process to be followed for reassigning employees to Miami and filling vacancies in Washington.  (Def.'s Ex. 2 ["Poggioli Decl."] ¶ 7.)[1]  The agreement provided that priority consideration for vacancies (announced or unannounced) in other areas of the agency would be given to OCB employees who had indicated on their "canvass letters"[2] an interest in remaining in Washington.  (Agreement ¶ 1.b. (attached to Def.'s Ex. 23); *see also* Poggioli Decl. ¶ 11.)  It also provided that BBG would seek employees in Washington who were interested in reassignment to OCB in Miami to participate in "job swaps" with OCB employees who wished to remain in Washington.  (*See* Agreement ¶ 2.a.)

The relocation of OCB to Miami occurred in phases between 1996 and 1998.  (Poggioli Decl. ¶ 9.)  In June 2006, OCB circulated a memorandum regarding the schedule for relocating managers and supervisors in OCB's Department of Technical Operations to Miami.  (Pl.'s Ex. 3; *see also* Def.'s Statement ¶ 4.)  The memorandum set transfer dates for three

---

[1]According to Mary Poggioli, who was a member of the management bargaining team, although plaintiff was a management employee and not a member of the bargaining unit, the same arrangements were afforded to non-bargaining unit members.  (*Id.* ¶¶ 5, 11.)

[2]Ms. Poggioli's declaration indicates that in June 2006, "canvass letters" were sent to all OCB employees asking whether they would accept a transfer to Florida or were interested in continued employment in Washington, D.C. and notifying them that there was no guarantee that positions could be found in Washington for employees who chose not to relocate.  (*Id.* ¶ 10.)

managers/supervisors in 1996 but listed plaintiff's transfer date, and that of most of the others on the list, as "to be determined." (Pl.'s Ex. 3.) According to Ms. Poggioli's declaration, under the reduction in force ("RIF") procedures, positions were placed in competitive levels by type and grade, and positions within a particular competitive level were relocated based on seniority with the least senior employees being relocated first, followed by the more senior employees. (*See* Poggioli Decl. ¶ 9.) Although all OCB employees were offered their identical positions in Miami, employees did not receive a Formal Offer of Position until they were to be relocated. (*Id.* ¶¶ 8-9.) Because plaintiff had the most seniority in his competitive level, which included the other GS-12 supervisory broadcast technicians, he did not receive a Formal Offer of Position until April 1998. (*Id.* ¶ 9; Def.'s Ex. 5.)

In the meantime, plaintiff attempted to find other employment with the BBG so that he could remain in Washington, pursuing a job swap with a GS-12 radio production specialist for the Voice of America ("VOA") and applying for other permanent positions in the Washington area. (Pl.'s Ex. 4 ["Alexander Aff."] ¶¶ 7.A., 8.A.; Pl.'s Ex. 22 at 4-6 (plaintiff's Answers to Interrogatories No. 6 & 9); *see also* Am. Compl. ¶ 24.) These efforts, however, were unsuccessful. Thomas Warden, plaintiff's immediate supervisor, declined to approve the job swap (Alexander Aff. ¶ 7.A.; *see also* Def.'s Ex. 4 ["Warden Aff."] ¶ 7.A.), and plaintiff was not selected for any of the permanent positions for which he applied. (Pl.'s Ex. 22 at 4-6 (plaintiff's Answers to Interrogatories No. 6 & 9).) In May 1998, plaintiff was offered a term position as a radio broadcast technician with VOA; however, plaintiff declined the offer. (Poggioli Decl. ¶ 21; Alexander Aff. ¶ 8.A.)

On April 28, 1998, defendant issued to plaintiff a Formal Offer of Position, offering him

a position in Miami "at the same title, series, grade, status and organizational unit" as his then-current position and providing for a small salary increase based on the locality pay for the Miami area. (Def.'s Ex. 5; Def.'s Statement ¶¶ 8-9.) The Offer included a reporting date of June 1, 1998, and indicated that plaintiff's relocation expenses would be paid. (Def.'s Ex. 5; Def.'s Statement ¶ 9.) Plaintiff accepted the offer on May 13, 1998, noting that his decision was "made under 'Economic and Mental Duress!'" (Def.'s Ex. 5.) The following month, defendant notified plaintiff that he would be required to report to work in Miami on July 9, 1998, but that date, too, was later extended. (Def.'s Ex. 6; Def.'s Statement ¶ 10; Pl.'s Dep. at 102-03.)

On July 8, 1998, plaintiff, who was then 57 years old, contacted the United States Information Agency's ("USIA")[3] Office of Civil Rights, and the following day, plaintiff had an initial counseling interview, at which time he complained that he had been discriminated against on the basis of race and age when two of his coworkers received permanent jobs with VOA in Washington, while he was only offered a term position. (Pl.'s Ex. 16; Pl.'s Ex. 5 at 2.)

Plaintiff thereafter reported to Miami on July 17, 1998. (Poggioli Decl. ¶ 22; *see also* Pl.'s Ex. 12.) Soon after his arrival, he requested and was given six weeks of annual leave to return to Washington to make preparations to move his family to Miami. (*Id.* at 1; Pl.'s Dep. at 103-04.) On October 5, 1998, the date that plaintiff was expected to return to work in Miami, he notified Warden that he was ill and indicated that his doctor would be providing documentation regarding his illness.[4] (Pl.'s Ex. 7 at 1; *see also* Pl.'s Ex. 5 at 7-8; Pl.'s Ex. 12 at 1.) Sometime

---

[3]The Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, §§ 1301 *et seq.*, dissolved the USIA on October 1, 1999 and transferred its functions to the BBG.

[4]Plaintiff disputes defendant's assertion that he requested to be placed on sick leave on or about October 5, 1998. (Pl.'s Statement of Disputed Material Facts ["Pl.'s Statement"] ¶ 5.)

the following week, Warden called plaintiff and advised him that he would be placed on AWOL

status as of October 11, 1998, if he did not provide documentation of his illness.  (Alexander Aff.

¶ 9.A.; Pl.'s Ex. 7 at 1; Pl.'s Ex. 5 at 8; *see also* Pl.'s Statement ¶ 5.)  On October 14, 1998,

plaintiff's psychologist, Dr. Nickole Scott Conerly, sent a letter to Warden indicating that

plaintiff was suffering from severe anxiety and major depression disorder caused by the stress of

learning that he would not have employment unless he relocated his family and recommending

that plaintiff be granted a medical leave of absence to work on repairing his mental health.  (Pl.'s

Ex. 8; Def.'s Statement ¶ 14; Pl.'s Statement ¶ 6.)  Based on Dr. Conerly's estimation that

plaintiff's condition would require about six months of treatment, Warden approved six months

of sick leave beginning October 5, 1998.  (Pl.'s Ex. 9; Def.'s Statement ¶ 15.)  In addition, as Dr.

Conerly had indicated that plaintiff would be seeing a physician to rule out any medical disorders

and that he may need to see a psychiatrist about medication, Warden requested that plaintiff

provide him with medical certificates concerning any additional treatments related to his

condition and directed plaintiff to provide a new current medical certificate in the event that he

needed additional sick leave after April 5, 1999.  (Pl.'s Ex. 9.)

On December 23, 1998, plaintiff filed a formal EEO complaint, again alleging that he had

been denied equal treatment when two of his coworkers were placed in comparable permanent

positions at VOA while he was only offered a term position, despite having greater seniority.

(Pl.'s Ex. 17.)

On March 5, 1999, Warden wrote to plaintiff advising him that his current leave of

---

However, in a letter to Mr. Warden dated March 22, 1999, plaintiff states that he informed
Warden of his illness on October 5.  (Pl.'s Ex. 7 at 1.)

absence would expire on April 5, 1999, and that he was expected to return to duty on that date. (Pl.'s Ex. 20.)  The letter reminded plaintiff that if he needed additional leave beyond April 5, he should provide a current medical certificate, as well as certificates from his physician and psychiatrist as previously requested.  (*Id.*)  The letter also indicated that plaintiff's continuing absence was causing a hardship on OCB and that the office could not grant him an indefinite leave of absence.  (*Id.*)  Plaintiff responded on March 22, 1999, notifying Warden that he had been advised by his doctor not to return to work in Miami at that time, requesting that he be permitted to remain on sick leave indefinitely, and indicating that current medical information would be forwarded and that he would provide Warden with "ample notification if and when I am able to return to work in Miami."[5]  (Pl.'s Ex. 7.)  A few days later, Dr. Conerly sent another letter to Warden indicating that plaintiff was suffering from stress and a depressed mood and recommending that he be granted additional sick leave.  (Pl.'s Ex. 10.)  Warden thereafter approved plaintiff's request for additional sick leave but advised him that his absence could not go on indefinitely and that if he was unable to return to duty in the near future, Warden would "have no choice but to recommend that [his] employment be terminated."[6]  (Pl.'s Ex. 11.)

On October 13, 1999, having heard nothing further from plaintiff as to when he expected

---

[5]Plaintiff disputes having requested to remain on sick leave indefinitely, noting that Dr. Conerly had seen improvement in plaintiff's condition and thus simply requested an additional period of sick leave (Pl.'s Statement ¶ 7); however, plaintiff stated in his March 22, 1999 letter that "I'm requesting to remain on sick leave indefinitely."  (Pl.'s Ex. 7 at 2.)

[6]Warden suggested that he would delay making such a recommendation for two weeks to permit plaintiff sufficient time to either report for work in Miami or, if medically unable to do so, to apply to a leave of absence under the Family and Medical Leave Act.  (Pl.'s Ex. 11.)  Warden also advised plaintiff to speak with a personnel specialist if he believed he was disabled for duty. (*Id.*)

to be able to return to duty, Michael Pallone, the director of OCB's Office of Technical

Operations, wrote to plaintiff advising him that his continuous absence since August 13, 1998,

constituted excessive use of leave and proposing to remove him from his position as a penalty.

(Pl.'s Ex. 12.)  The letter also advised plaintiff of his right to reply to the proposed action, which

plaintiff did both orally and in writing the following month.  (*Id.*; Pl.'s Ex. 21 at 1.)  On

December 17, 1999, Herminio San Roman, the Director of OCB, issued a written decision

finding the charge of excessive use of leave to be supported by a preponderance of the evidence

and indicating that plaintiff would be removed from his position effective January 3, 2000.  (*Id.*)

Prior to that date, however, plaintiff retired effective December 31, 1999.  (Poggioli Decl. ¶ 22.)

On December 24, 1999, plaintiff submitted a second EEO complaint, alleging that San Roman's

decision to remove him from his position was "retaliatory harassment" and requesting that this

action by San Roman be included in his original complaint.  (Pl.'s Ex. 18.)

      In April 2005, plaintiff instituted suit here, and on October 20, 2005, he filed an amended

complaint.  Plaintiff alleges that defendant discriminated against him based on his race and age

by denying him a job swap, by failing to find a position for him in Washington, D.C. so that he

would not have to relocate to Miami, and by effectively removing him from his position for

excessive use of leave.  Plaintiff also alleges that defendant retaliated against him by removing

him from his position after he filed an EEO complaint; discriminated against him on the basis of

disability; and subjected him to a hostile work environment.

## ANALYSIS

### I.     Summary Judgment Standard

      Summary judgment is appropriate only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *see also Wash. Post Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

"A dispute about a material fact is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Haynes v. Williams*, 392 F.3d 478, 481 (D.C. Cir. 2004) (quoting *Anderson*, 477 U.S. at 248). Thus, the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). The moving party "is 'entitled to judgment as a matter of law' if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Haynes*, 392 F.3d at 481 (quoting *Celotex Corp.*, 477 U.S. at 322). "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. March 31, 1998) (internal citation omitted), *aff'd*, No. 99-5126, 1999 WL 825425 (D.C. Cir. Sept. 27, 2000).

8

II.     **Race and Age Discrimination Claims**

    A.     **Legal Standard**

      Where, as here, the record contains no direct evidence of discrimination, allegations of race discrimination under Title VII and 42 U.S.C. § 1981 and age discrimination under the ADEA are all analyzed under the all too familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006) (ADEA claims); *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999) (Title VII claims); *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1553 (D.C. Cir. 1997) (§ 1981 claims). Under that framework, the plaintiff has the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case of race or age discrimination, the plaintiff must show (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; and (3) that the unfavorable action gives rise to an inference of discrimination. *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006).

      If plaintiff succeeds, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. *See McDonnell Douglas*, 411 U.S. at 802. The defendant's burden is only one of production; it "need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If defendant is successful, then "the *McDonnell Douglas* framework - - with its presumptions and burdens - - disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks omitted). At that point, plaintiff has the burden of persuasion to

show that defendant's proffered nondiscriminatory reason was not the true reason for the

employment decision. *Burdine*, 450 U.S. at 256; *see also Morgan v. Fed. Home Loan Mortgage

Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) ("Although the *McDonnell Douglas* framework shifts

'intermediate evidentiary burdens' between the parties, '[t]he ultimate burden of persuading the

trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times

with the plaintiff.'") (quoting *Reeves*, 530 U.S. at 143 (internal citation and quotation marks

omitted)).

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable

trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination,

summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*,

119 F.3d 23, 27-28 (D.C. Cir. 1997). Pretext may be established "directly by persuading the

court that a discriminatory reason more likely motivated the employer or indirectly by showing

that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

"'It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair,

or sensible. He must show that the explanation given is a phony reason.'" *Fischbach v. D.C.

Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Pignato v. Am. Trans Air, Inc.*, 14

F.3d 342, 349 (7th Cir. 1994)). "Once the employer has articulated a non-discriminatory

explanation for its action, . . . the issue is not the 'correctness or desirability of [the] reasons

offered . . . [but] whether the employer honestly believes in the reasons it offers.'" *Id.* (quoting

*McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)). In other words, a district

court judge does not sit as a "super-personnel department that reexamines an entity's business

decisions." *Id.*

### B.    Prima Facie Case

Plaintiff maintains that defendant discriminated against him on the basis of his race and

age in three ways: (1) by denying him a requested job swap; (2) by failing to find him a

permanent position in Washington; and (3) by deciding to remove him for excessive use of leave.

(*See* Pl.'s Opp'n at 8-10.)  Defendant concedes that plaintiff, who is African-American and over

the age of forty, is a member of a protected class for purposes of Title VII and the ADEA, but

argues that he has failed to establish that he suffered an adverse employment action or an

inference of discrimination.  (Def.'s Mot. at 17.)[7]

### 1.    Adverse Employment Action

In essence, plaintiff's first two discrimination claims challenge the denial of a lateral

transfer that would have permitted him to remain in Washington in lieu of moving to Miami as

part of the OCB relocation.  Plaintiff does not contend, and the record does not reflect, that the

GS-12 VOA radio production specialist position he sought as part of the proposed job swap

would have resulted in an increase in salary, grade level, or benefits.  Indeed, the agreement that

established the job swap procedures specifically provided that the swaps were "for

**reassignments** only - - an employee cannot gain a promotion or a position with a higher

---

[7]Defendant also argues that plaintiff failed to exhaust his administrative remedies as to some of his race and age discrimination claims and that certain of those claims are time-barred because plaintiff's administrative complaint was untimely.  (*See* Def.'s Mot. at 8-16.)  As noted, plaintiff has asserted claims for race discrimination both under Title VII, which requires administrative exhaustion, *see Jarrell v. U.S. Postal Serv.*, 753 F.2d 1088, 1091 (D.C. Cir. 1985), and under 42 U.S.C. § 1981, which does not.  *See Foster v. Gueory*, 655 F.2d 1319, 1323 (D.C. Cir. 1981).  Because defendant's exhaustion and statute of limitations arguments, even if meritorious, would not dispose of plaintiff's race discrimination claims under section 1981, and because the Court finds that summary judgment is warranted as to all of plaintiff's race and age discrimination claims on other grounds, the Court declines to address these arguments.

promotion potential."  (Agreement ¶ 2.a. (attached to Def.'s Ex. 23).)  Nor does plaintiff suggest

that his salary, grade level, or benefits would have been enhanced in any way had the BBG found

him a permanent position in Washington.[8]  *See Brown*, 199 F.3d at 457 (defining a lateral

transfer as "one in which [the employee] suffers no diminution in pay or benefits").

In this circuit, a lateral transfer or the denial thereof can constitute an adverse

employment action, but only when accompanied by "some other materially adverse consequences

affecting the terms, conditions, or privileges of [the employee's] employment or [his] future

employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has

suffered objectively tangible harm."  *Id.*  A lateral transfer that results in withdrawal of an

employee's supervisory duties, for example, constitutes an adverse employment action, as does a

reassignment with significantly different responsibilities.  *Czekalski v. Peters*, 475 F.3d 360, 364

(D.C. Cir. 2007).  "Mere idiosyncrasies of personal preference," however, are "not sufficient to

state an injury."  *Brown*, 199 F.3d at 457.

Here, plaintiff tries to cast defendant's failure to approve his job swap or to find him a

permanent position in Washington as adverse based only on his strong personal desire "to avoid

relocation."  (Pl.'s Opp'n at 2.)  Plaintiff does not identify any way in which the supervisory

broadcast technician position in Miami, which was identical to the position he held in

Washington before the OCB relocation, was objectively inferior to the VOA position he sought

to swap into (or to any other position he should have been offered in Washington).  Although

understandable, plaintiff's subjective desire to remain in Washington is not the sort of job-related

---

[8]In fact, at least one of the Washington-area positions that plaintiff applied for was a GS-
11 position.  (*See* Pl.'s Ex. 22 at 6 (plaintiff's Answer to Interrogatory No. 9).)

attribute that serves to convert a lateral transfer into an adverse employment action. *See Medina v. Henderson*, No. 98-5471, 1999 WL 325497, at *1 (D.C. Cir. Apr. 30, 1999) (citing *DiIenno v. Goodwill Indus.*, 162 F.3d 235, 236 (3d Cir. 1998)).  In *Medina*, the Court of Appeals summarily affirmed the dismissal of an employee's retaliation claim, finding that, absent extraordinary circumstances, the decision to relocate the employee from Denver to Washington, D.C. did not constitute an adverse employment action, where the relocation "would not require a material change in [the employee's] title, duties, salary, benefits, or working hours, or otherwise amount to a constructive demotion." *Id.*  Although *Medina* has no precedential value, *see* D.C. Cir. Rule 32.1(b)(1)(A), the Court of Appeals has consistently reaffirmed that a lateral transfer must have materially adverse job-related consequences to qualify as an adverse action, for "purely subjective injuries . . . are not adverse actions." *Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002); *see also Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006); *Roebuck v. Washington*, 408 F.3d 790, 794 (D.C. Cir. 2005).[9]

Several other circuits have reached this same conclusion.  *See, e.g.*, *Turner v. Gonzales*, 421 F.3d 688, 697 (8th Cir. 2005) (FBI special agent's transfer from North Dakota to Minnesota did not by itself constitute an adverse employment action where transfer had no effect on agent's title, salary, and benefits); *Williams v. R.H. Donnelly, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (denial of plaintiff's request to transfer from New York to Las Vegas, where plaintiff maintained

---

[9]*Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840 (D.C. Cir. 2001), is not to the contrary.  In that case, the D.C. Circuit held that an employee's lateral transfer from the day to the night shift could constitute a change in the conditions or privileges of employment sufficient to qualify as an adverse employment action where the plaintiff had presented evidence that the change in hours interfered with his education and that the night-shift position was objectively undesirable.  *Id.* at 844.  Plaintiff has presented no similar evidence here.

a home, did not create a materially significant disadvantage in her working conditions as "[s]uch subjective, personal disappointments do not meet the objective indicia of an adverse employment action"); *cf. DiIenno*, 162 F.3d at 236 (suggesting that the "desire to live in a certain city" is not a job-related attribute that should be taken into account when determining whether a lateral transfer was an adverse employment action).[10]

Because plaintiff has presented no evidence that the denial of a position in Washington was an adverse employment action, he cannot establish a prima facie case with respect to his first two discrimination claims.

## 2. "Similarly Situated"

In addition to not being able to satisfy the second prong of a prima facie case, plaintiff cannot establish the third prong. One way a plaintiff can satisfy this element is by "demonstrating that [he] was treated differently from similarly situated employees who are not part of the protected class." *Czekalski*, 475 F.3d at 365-66. To prove that he is similarly situated to another employee, a plaintiff must "demonstrate that 'all of the relevant aspects of [his] employment situation were nearly identical to those of the [allegedly comparable]' employee." *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (quoting *Neuren v. Adduci, Mastriani,*

---

[10]The Sixth Circuit has reached the same conclusion in an unpublished decision. *Momah v. Dominguez*, No. 03-2561, 2007 WL 1804353, at *9-10 (6th Cir. June 21, 2007) (denial of a lateral transfer from Memphis to Detroit, which denied plaintiff the opportunity to be closer to his family, was not an adverse employment action where plaintiff produced no evidence that the position in Memphis was objectively worse than the identical position in Detroit). In *Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir. 1997), the First Circuit held that the denial of a request for a hardship transfer from a government agency's Denver office to its Boston office could constitute an adverse employment action; however, the court noted that the plaintiff's evidence "ma[d]e clear that at [the agency] a permanent transfer for hardship reasons is a common enough practice and so arguably a 'privilege' of employment."

*Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (internal citation and quotation marks omitted)).  Although this is not the only way a plaintiff can show that the allegedly adverse employment action gives rise to an inference of discrimination, *id.* at 366, this is the method that plaintiff relies on here.  Plaintiff alleges that several younger, Caucasian employees who, like him, did not want to relocate to Miami were provided job swap opportunities or were placed in permanent positions in Washington.  (Am. Compl. ¶¶ 21-23, 25-27, 58-60, 63, 73; Pl.'s Opp'n at 8-10.)  He also alleges that while he was removed from his position for excessive use of leave, a younger, Caucasian employee was permitted to take an extended leave without any similar repercussions.  (Am. Compl. ¶¶ 42, 62; Pl.'s Opp'n at 10.)

With respect to his discrimination claims based on the denial of a job swap, plaintiff has failed to show that any of the other allegedly similarly-situated employees he identifies actually received a job swap.  Plaintiff states that Roger Levi "was allowed to do a job swap to Miami and then was allowed to swap again to return to Washington once he decided he did not like Miami." (*Id.* at 9.)  The only evidence he cites in support of this assertion, however, is his own affidavit in which he states that he "know[s] of several White employees who didn't want to move to Miami and were placed in jobs in Washington," including Levi, who "swapped to go to Miami, had a change of heart and eventually came back to Washington."  (Alexander Aff. ¶ 7.A.)  The affidavit gives no indication as to the basis for plaintiff's knowledge.  This unsupported assertion is insufficient to raise a factual issue as to whether that Levi received a job swap, particularly where Mary Poggioli, who was responsible for ensuring that RIF procedures were implemented correctly and therefore has personal knowledge of relocation and RIF information concerning OCB employees affected by the move, has stated that Levi "did not receive a job swap."

15

(Poggioli Decl. ¶¶ 5, 19.)

Plaintiff has likewise failed to prove a prima facie case of discrimination with respect to his claims based on the failure to place him in a permanent position in Washington.  Although plaintiff identifies five employees who were supposedly "placed" in permanent positions (Pl.'s Opp'n at 9), the record (apart from plaintiff's unsubstantiated assertion that Roger Levi was granted two job swaps) reflects that two of these individuals - - Levi and Glen Von Calio - - were not placed but obtained their positions competitively.[11]  (Poggioli Decl. ¶¶ 18-19 (listing positions, including job announcement numbers, for which Von Calio and Levi "applied and w[ere] selected").)  Indeed, Von Calio was actually separated from his OCB position with Radio Martí in September 1998 and then re-hired by VOA effective January 1999.  (*Id.* ¶ 18.)  While it appears that Gail Granata, Richard Seifert, and Dave London were placed in positions in Washington non-competitively (*id.* ¶¶ 12-13, 17 (describing "reassign[ments]" for Seifert, Granata, and London, respectively), plaintiff has not demonstrated that he was similarly situated to any of these individuals.  Dave London was reassigned to a position with VOA "so that his seriously ill wife could continue her medical treatment in the Washington, D.C. area" (*id.* ¶ 17), a factor that clearly was not present in plaintiff's situation.  Granata and Seifert received formal offers of employment in Miami (which they declined) in August 1996, making them eligible for priority consideration for vacant positions more than eighteen months earlier than plaintiff, who did not receive a Formal Offer of Position until April 1998.  (Def.'s Ex. 23 ["Rasmussen Aff."] ¶ 11.A.; Def.'s Ex. 27; Poggioli Decl. ¶¶ 12-13; *see also* Agreement ¶ 1.b. (providing that priority

---

[11]Plaintiff does not suggest that he applied for and was not selected for the positions that Levi and Von Calio ultimately obtained.

consideration for positions in Washington, D.C. "will occur after providing priority assistance to employees affected by a previous RIF") (attached to Def.'s Ex. 23).)  Under the terms of the agreement concerning RIF procedures, Granata and Seifert, having been included in the initial RIF notice, were entitled to higher priority consideration for vacant positions in Washington than other OCB employees, including plaintiff (*id.*), and they were therefore not similarly situated to plaintiff.  In response, plaintiff asserts that he is similarly situated to Seifert because in OCB's June 21, 1996 memo regarding the relocation of technical department managers and supervisors, both he and Seifert are listed as scheduled for relocation as part of phase three.  (Pl.'s Opp'n at 9.)  The memo, however, lists the transfer date for both men as "to be determined" (Pl.'s Ex. 3), while defendant's declarations establish that, in fact, based on his lesser seniority, Seifert received his offer of employment in August 1996.  (Rasmussen Aff. ¶ 11.A.; Def.'s Ex. 27; *see also* Warden Aff. ¶ 10.A. (stating that Seifert and Granata's positions were abolished about eighteen months earlier than plaintiff's).)

As for his discrimination claims based on his removal for excessive use of leave, that claim also fails because plaintiff has not demonstrated that he was similarly situated to Ted Tate, the OCB employee who was permitted to take extended leave without any repercussions.  Tate, who at one time was plaintiff's second-level supervisor, had a written agreement with the OCB granting him a ten-month leave of absence for educational reasons from August 1998 until June 1999.  (Def.'s Ex. 26; Poggioli Decl. ¶ 20.)  The agreement provided that Tate's position with OCB would not be filled on a permanent basis during his approved absence; however, it required him to sign a Resignation that would become effective if he did not return to duty by close of

17

business on June 7, 1999.[12]  (Def.'s Ex. 26; Poggioli Decl. ¶ 20.)  In contrast to Tate, whose

agreement regarding the terms and total duration of his leave were in place at the beginning of

the leave period, thus permitting OCB to plan for his absence, plaintiff took leave in three

separate increments.  While the first two of those increments were approved for a set period of

time (six weeks of annual leave followed by six months of sick leave), in his third leave request,

plaintiff sought to remain on sick leave "indefinitely."  (Pl.'s Ex. 7 at 2.)  Plaintiff has not shown

that the relevant aspects of his leave situation were "nearly identical" to Tate's.  *Holbrook*, 196

F.3d at 261.  Therefore, plaintiff also has failed to establish a prima facie case of discrimination

with respect to his removal for excessive use of leave.

## III.   Retaliation Claim

Plaintiff's retaliation claim is subject to the same *McDonnell Douglas* burden-shifting

framework as his discrimination claims.  *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C.

Cir. 2005).  To establish a prima facie case of retaliation, plaintiff must show (1) that he engaged

in protected activity; (2) that he was subjected to adverse action by his employer; and (3) that

there was a causal link between the adverse action and the protected activity.  *Id.*  Here, plaintiff

alleges that he was removed from federal service in retaliation for filing EEO complaints alleging

race and age discrimination.[13]  (*See* Am. Compl. ¶ 54; Pl.'s Opp'n at 20.)

---

[12]Ultimately, Tate decided not to return to OCB, and the agency processed his previously-submitted Resignation in accordance with the terms of the agreement.  (Poggioli Decl. ¶ 20.)

[13]Plaintiff also asserts that certain actions taken by Mr. Warden were retaliatory, including his requests for medical documentation of plaintiff's illness and his threat that plaintiff would be placed on AWOL status if he did not submit such documentation.  (*See* Pl.'s Opp'n at 20; Am. Compl. ¶¶ 46-48.)  Plaintiff does not suggest, however, that he was ever actually placed on AWOL status.  Moreover, plaintiff acknowledges that despite Warden's allegedly unprecedented requests for documentation, he ultimately approved both of plaintiff's requests for sick leave.

Defendant concedes that plaintiff has satisfied the first two elements of a prima facie case, but he argues that plaintiff cannot satisfy the causation element because there was a seventeen-month lapse between his initial EEO contact in July 1998 and the decision to remove him from his position on December 17, 1999.  (Def.'s Mot. at 27-29.)  In the absence of direct evidence, the Court may infer a causal connection between protected activity and an adverse action based on a "showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity."  *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985).  Here, Pallone knew that plaintiff had filed an EEO complaint when he proposed that plaintiff be removed from his position, and San Ramon knew about the EEO complaint when he decided to remove plaintiff.  (Def.'s Ex. 24 ¶ 9.A.; Def.'s Ex. 25 ¶ 9.A.; *see also* Def.'s Opp'n at 29 n.4; Def.'s Reply at 11.)  Significantly, Pallone's affidavit indicates that he first learned about plaintiff's EEO complaint on or about August 22, 1999, less than two months before he recommended plaintiff's removal on October 19, 1999.  (Def.'s Ex. 24 ¶ 9.A.)  It therefore appears that plaintiff has sufficiently established the causation element of his prima facie case.  *See Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007).

Nevertheless, plaintiff's retaliation claim fails under the *McDonnell Douglas* framework. Notwithstanding plaintiff's argument to the contrary (*see* Pl.'s Opp'n at 21), defendant has presented a legitimate, nondiscriminatory reason for its decision to remove plaintiff from his position.  In his December 17, 1999 letter setting forth his decision to remove plaintiff, San

_____

(Pl.'s Opp'n at 19.)  Warden's actions therefore do not rise to the level of an adverse employment action that can support a claim of retaliation.  *See Jones v. D.C. Dep't of Corrections*, 429 F.3d 276, 282 (D.C. Cir. 2005) (defendant's efforts to verify plaintiff's claim that her cousin had been murdered was not an adverse employment action where evidence did not show that defendant actually refused to give her time off to attend her cousin's funeral).

Roman explained that plaintiff's absence, which began sixteen months earlier on August 13, 1998, had continued beyond a reasonable period of time; that there was a critical need for plaintiff's services on a regular, full-time basis; and that the OCB had no expectation that plaintiff would report to work in Miami in the foreseeable future, given his request to remain on leave indefinitely.  (Pl.'s Ex. 21.)  San Roman concluded that removal was an appropriate penalty in these circumstances, noting that "[p]rolonged absence with no foreseeable end is just cause for removal because it constitutes a burden which no employer can efficiently endure."  (*Id.*)  *See Bennett v. Watters*, 260 F.3d 925, 930 (8th Cir. 2001) (defendant satisfied its burden to offer a legitimate, nondiscriminatory reason for plaintiff's termination by producing evidence that plaintiff was terminated for, *inter alia*, excessive sick leave); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997) (same).

At this stage, plaintiff must "put forward enough evidence to defeat [defendant's] proffer and support a finding of retaliation." *Woodruff*, 482 F.3d at 530.  Although in "exceptional circumstances, the evidence supporting a plaintiff's prima facie case may, on its own, suffice to defeat the proffer's presumption of validity and thus render summary judgment improper," a retaliation plaintiff must produce some "positive evidence beyond mere proximity . . . to defeat the presumption that the proffered explanation[] [is] genuine." *Id.*  Here, plaintiff offers two arguments why defendant's proffered explanation is unworthy of credence, but neither is persuasive.

Plaintiff first argues that the defendant "never addresse[d] any specific needs for him to be at his post within the Agency." (*Id.* at 21.)  On the contrary, defendant repeatedly advised plaintiff during his absence that he was needed back at work.  On March 5, 1999, one month

before plaintiff's initial six-month leave of absence was to expire, Warden informed him that his

"continued absence [was] causing a hardship on this office."  (Pl.'s Ex. 20.)  Although plaintiff

regarded the letter, which included a request for additional medical documentation of plaintiff's

illness, as discriminatory, he agreed with Warden's assessment of the hardship caused by his

absence. (Pl.'s Ex. 7 ("[Y]ou also talked about the hardship my absence is causing on the office.

I wholeheartedly agree with that statement.  Considering the superb quality of my work and

number of task[s] assigned to me, I know it's very difficult to find any one person to do what I

was doing.").)  Warden raised the issue again the following month when he approved plaintiff's

request for additional sick leave but cautioned that the OCB "need[ed] to fill [his] position of

Supervisory Broadcast Technician by someone who is available for duty on a regular basis."

(Pl.'s Ex. 11.)  Six months later, when Pallone proposed to remove plaintiff from his position for

excessive use of leave, he, too, addressed OCB's "critical need for [plaintiff's] services,"

explaining that

> [a]s a Supervisory Broadcast Technician in Radio Marti, your primary
> responsibility is to supervise a staff of Broadcast Technicians engaged in
> the technical aspects of broadcasting news and features to Cuba, around
> the clock, 7 days a week.  Other significant duties include taking necessary
> actions to ensure signal quality of Radio Marti programming and to
> minimize equipment failure and interruptions in broadcasting.  This
> position, being one of only three Supervisory Broadcast Technicians, must
> be filled by an employee who is available for duty on a regular, full-time
> basis.

(Pl.'s Ex. 12 at 2.)  Finally, San Roman's decision to remove plaintiff also noted that it was "well

established that there is a critical need for [plaintiff's] services on a regular, full-time basis."

(Pl.'s Ex. 21 at 2.)

Plaintiff also contends that defendant's proffered explanation for his removal is pretextual

because Warden is not credible, having "attempted to 'cover up' his knowledge that [plaintiff] had initiated this discrimination complaint."  (Pl.'s Opp'n at 22.)  In particular, plaintiff notes that while Warden indicated in his August 25, 1999 affidavit that he "was not aware that [plaintiff] had filed an EEO complaint until . . . August 24, 1999" (Warden Aff. ¶ 16.A.), in fact he had been contacted by an EEO counselor about plaintiff ten months earlier in October 1998. (Pl.'s Ex. 5 at 8 (EEO counselor's notes reflecting telephone conversation with Warden on October 14, 1998).)  Although this inconsistency may cast some doubt on Warden's credibility, Warden was not the decisionmaker with respect to plaintiff's removal from his position.  Rather, that action was proposed by Pallone and, after plaintiff was afforded an opportunity to respond, approved by San Roman.  Thus, because no reasonable juror could conclude, based on Warden's conduct or credibility, that defendant's proffered justification for plaintiff's removal was pretextual or that a retaliatory animus motivated the defendant's actions with respect to plaintiff's termination, summary judgment is also appropriate with respect to plaintiff's retaliation claim.[14]

## IV.  **Disability Discrimination**[15]

### A.  **Exhaustion**

---

[14]To the extent that plaintiff also seeks to rely on the fact that he was on approved sick leave when defendant removed him as evidence of pretext (*see* Pl.'s Opp'n at 20), that argument is without merit.  When Warden approved plaintiff's second request for sick leave on April 19, 1999, he expressly advised plaintiff that his absence could not go on indefinitely and that if plaintiff was unable to return to duty in the near future, Warden would "have no choice but to recommend that [plaintiff's] employment be terminated."  (Pl.'s Ex. 11 at 1.)

[15]While the introductory paragraph of plaintiff's amended complaint refers to Section 501 of the Rehabilitation Act (Am. Compl. ¶ 1), Count III, which alleges discrimination based on disability, refers only to Section 504 of the Act.  (*Id.* ¶¶ 65-71.)  Because, as a federal employee, plaintiff may only sue under Section 501, *Taylor v. Small*, 350 F.3d 1286, 1291 (D.C. Cir. 2003), the Court must assume that plaintiff is proceeding under Section 501 of the Act.

Defendant argues that plaintiff's claim for disability discrimination should be dismissed because plaintiff failed to exhaust his administrative remedies.  (Def.'s Mot. at 24-25.)  Like Title VII, the Rehabilitation Act mandates administrative exhaustion.  *Taylor*, 350 F.3d at 1292. This exhaustion requirement is not a "mere technicality," but "serves the important purposes of giving the charged party notice of the claim and 'narrow[ing] the issues for prompt adjudication and decision.'" *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (quoting *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 472 n.325 (D.C. Cir. 1976)).  Accordingly, the claims that the plaintiff seeks to pursue in federal court must be "'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Id.* (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)).  While "every detail of the eventual complaint need not be presaged in the [administrative] filing," the substance of the plaintiff's Rehabilitation claim "must fall within the scope of 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (quoting *Park*, 71 F.3d at 907).

Plaintiff contends that he exhausted his disability claim by filing a supplemental EEO complaint with the BBG in December 1999, but that complaint makes no mention of a disability claim.  On December 24, 1999, plaintiff wrote to the director of the BBG's Office of Civil Rights, indicating that he had received San Roman's December 17, 1999 letter outlining his decision to remove plaintiff for excessive use of leave and stating:

> In light of the circumstances surrounding my leave status, I view Mr. San Roman's decision as the ultimate action in management **"retaliatory harassment."**  Therefore, I am requesting that the action taken by Mr. San Roman be included in my original Complaint of Discrimination.

(Pl.'s Ex. 18.)  In addition to notifying plaintiff of the decision to remove him, the letter from San

Roman that precipitated plaintiff's complaint indicated that the BBG had considered its

obligations under the Rehabilitation Act "to provide reasonable accommodation to the known

physical or mental impairments of a qualified handicapped employee," but had concluded that

plaintiff was not a "qualified handicapped employee" as defined by the Act.  (Pl.'s Ex. 21 at 3.)

Despite this statement, plaintiff's complaint is silent regarding any claim of disability

discrimination.  Nor does the complaint suggest that plaintiff objected to the BBG's failure to

accommodate him.  The complaint does refer to the "circumstances surrounding [plaintiff's]

leave status," which includes the fact that plaintiff was on approved sick leave at the time the

decision to remove him was made.  But that single, vague reference to plaintiff's sick leave

cannot reasonably have been expected to have alerted the agency that plaintiff was complaining

about disability discrimination, particularly in light of plaintiff's statement that he viewed the

decision to remove him as "retaliatory harassment."[16]  *Compare Thrash v. Library of Congress*,

No. 04-0634, 2006 WL 463251, at *6 (D.D.C. Feb. 24, 2006) (finding that agency had sufficient

notice of plaintiff's disability discrimination claims despite her identification of only "race &

sex" as the bases of her discrimination charge where, in the section labeled "Nature of

allegation," plaintiff indicated that she could not "jeopardize [her] health and go against [her]

physician's advice").  Because plaintiff failed to exhaust his administrative remedies as to any

claim of disability discrimination, that claim must be dismissed for lack of jurisdiction.

---

[16]In May 2000, five months after plaintiff filed his supplemental EEO complaint, he
submitted an addendum to his July 23, 1999 affidavit, in which he addressed the December 1999
termination decision.  (Def.'s Ex. 18.)  Although the addendum discusses at length plaintiff's
belief that the decision to remove him was both retaliatory and "racially motivated," it makes no
reference to any claim of disability discrimination.  (*Id.*)

**B.     Prima Facie Case**

Even if plaintiff's Rehabilitation Act claim had been exhausted, dismissal would still be appropriate since plaintiff has failed to make out a prima facie case of disability discrimination under the *McDonnell Douglas* framework.  *See Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993) (noting applicability of *McDonnell Douglas* burden-shifting framework to claims of disability discrimination under the Rehabilitation Act).  To establish a prima facie case under the Rehabilitation Act, a plaintiff must show, *inter alia*, that he is an individual with a disability within the meaning of the statute.  *Thompson v. Rice*, 422 F. Supp. 2d 158, 165-66 (D.D.C. 2006).  A person is disabled under the Act if he "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment."  29 U.S.C. § 705(20)(B). Defendant argues that plaintiff has not shown that he satisfies the first definition, the only definition at issue here, because he has not produced sufficient evidence that his impairment "substantially limit[ed] one or more . . . major life activities."  (*See* Def.'s Mot. at 26.)  The Court agrees.

Plaintiff contends that he meets the statutory definition because, as a result of his severe anxiety and major depression, he was prevented from caring for himself.  (Pl.'s Opp'n at 25.) "[C]aring for one's self" is a "major life activity" under the applicable Equal Employment Opportunity Commission ("EEOC") and Department of Health and Human Services ("HHS") regulations.  29 C.F.R. § 1630.2(i) ("Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."); 45 C.F.R. § 84.3(j)(2)(ii) (same definition in HHS regulations); *see also Toyota*

*Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002) (term "major life activities" refers to "those activities that are of central importance to daily life").[17]  To prove that he is disabled, however, plaintiff must "'offer[] evidence that the extent of the limitation [caused by [his] impairment] in terms of [his] own experience . . . is substantial.'" *Id.* at 198 (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)).  Yet, the only evidence plaintiff has produced regarding the extent to which he has been prevented from caring for himself is his own declaration, prepared for this litigation, in which he states that from October 1998 through December 1999 he "was diagnosed with sever[e] anxiety and major depression that prevented [him] from eating, sleeping, and concentrating and as a result [he] was substantially limited from caring for [him]self throughout this period."  (Pl.'s Ex. 2 ¶ 4.)  This is plainly insufficient. Plaintiff refers to difficulties "eating, sleeping, and concentrating," but he provides no detail whatsoever regarding the nature or extent of these difficulties.  *See Thompson*, 422 F. Supp. 2d at 174 (plaintiff's assertion that she was substantially limited in caring for herself and reference to certain tasks, such as basic household tasks, driving long distances, and getting up in the morning was insufficient to survive summary judgment where plaintiff "provided little evidence to substantiate this claim, or otherwise describe the degree to which she is limited with any reasonable specificity"); *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 21 n.4 (D.D.C. 2002) (plaintiff failed to show that his sleep was substantially limited where he offered no evidence about the extent of his sleep troubles but cited only a physician's note that he experienced "poor

---

[17]Because of the similarity between the Rehabilitation Act and the ADA, "cases interpreting either are applicable and interchangeable."  *Allison v. Dep't of Corr.*, 94 F.3d 494, 497 (8th Cir. 1996); *see also Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999) (claims and defenses under the ADA and the Rehabilitation Act are "virtually identical").

sleep" and his expert's testimony that he suffered from "sleep disturbance"); *see also Carter v. George Washington Univ.*, 180 F. Supp. 2d 97, 111 (D.D.C. 2001) (noting that "self-serving affidavits alone will not protect the non-moving party from summary judgment"), *aff'd*, 387 F.3d 872 (D.C. Cir. 2004).   Moreover, plaintiff's suggestion in his amended complaint that defendant should have provided him with "reasonable accommodations" by assisting him in his efforts to find permanent employment in the Washington area (Am. Compl. ¶¶ 68-69), implying that if given a job in Washington he could have worked, undercuts his assertion that he was substantially limited in caring for himself.   Although a plaintiff's own testimony may be sufficient to create a genuine issue as to whether the extent of a particular limitation in terms of his own experience is substantial, *Haynes*, 392 F.3d at 482, plaintiff has not done so here. Accordingly, because plaintiff has not produced evidence from which a reasonable trier of fact could conclude that he was substantially limited in caring for himself, he has not established a prima facie case of disability discrimination, and summary judgment is therefore appropriate.[18]

---

[18]Plaintiff's disability discrimination claim also fails because he has not established that he "'was "qualified" for [his] position with or without reasonable accommodation.'"   *Thompson*, 422 F. Supp. 2d at 166 (quoting *Duncan v. Washington Metro. Area Transit Auth.*, 179 F.3d 929, 934 (D.C. Cir. 2001) (en banc)).   Plaintiff suggests that "[t]he problem with this argument for the Defendant is at no time has there been identified what the essential functions of a supervisor broadcast technician [are]."   (Pl.'s Opp'n at 24.)   But, "the ability to report for work" is "a minimal and basic qualification for any job," *Matzo v. Postmaster Gen.*, 685 F. Supp. 260, 263 (D.D.C. 1987), *aff'd*, 861 F.2d 1290 (D.C. Cir. 1988), which plaintiff's disability plainly prevented him from meeting.   *See also Trawick v. Hantman*, 151 F. Supp. 2d 54, 62 (D.D.C. 2001) (plaintiff failed to establish a prima facie case where it was "beyond dispute that both showing up when scheduled for duty and staying awake while on duty" were essential functions of plaintiff's position and where plaintiff did not identify a reasonable accommodation that would have enabled him to perform these essential functions), *aff'd*, 2002 WL 449777 (D.C. Cir. Feb. 21, 2002).

**V.**      **Hostile Work Environment**

Finally, plaintiff claims that he was subjected to a hostile work environment based on

Warden's attempts "to harass, threaten, and discipline [him] for his ongoing illness."  (Pl.'s

Opp'n at 27.)  To prevail on a hostile work environment claim, a plaintiff must show that the

defendant "subjected him to 'discriminatory intimidation, ridicule, and insult' of such 'sever[ity]

or pervasive[ness] [as] to alter the conditions of [his] employment and create an abusive working

environment.'"  *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006) (quoting *Harris v.*

*Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) (internal quotations omitted)).  To determine

whether a particular work environment is hostile, courts must look at "'all the circumstances,'

including the 'frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88

(1998) (quoting *Harris*, 510 U.S. at 23).

Applying these standards, it is clear that plaintiff has failed to make the required showing.

The only specific harassing act that plaintiff identifies is Warden's threat, in October 1998, to

place him on AWOL status even though plaintiff had informed him of his illness the previous

week.  (Pl.'s Opp'n at 26.)  However, as noted, there is no evidence that plaintiff was ever

actually placed on AWOL status.  Plaintiff also alludes to Warden's requests for medical

documentation of his illness, which plaintiff contends were unprecedented (Am. Compl. ¶ 46),

but Warden made only three such requests: (1) on October 11, 1998, after plaintiff had initially

called in sick on October 5 but before any medical documentation of his illness had been

received (*see* Pl.'s Ex. 5 at 8); (2) on October 28, 1998, when Warden granted plaintiff six

months of sick leave based on his treating psychologist's diagnosis and requested medical

certificates from any other treating physicians (Pl.'s Ex. 9); and (3) on March 5, 1999, a month

before plaintiff's initial six-month sick leave was to expire, when Warden again requested

medical certificates from any other treating physicians and advised plaintiff that he should submit

an updated medical certificate if he needed additional leave beyond April 5.  (Pl.'s Ex. 20.)

Moreover, as plaintiff acknowledges, Warden approved both of plaintiff's sick leave requests.

(Pl.'s Opp'n at 26-27.)  These incidents, which were infrequent, are neither severe nor physically

threatening and could not have altered the terms of plaintiff's employment since he was on leave

the entire time.  The Court therefore finds that these incidents are insufficient to support a hostile

work environment claim as a matter of law.  *See Vickers v. Powell*, - - - F.3d - - -, - - -, 2007 WL

1952369, at *9, 11 (D.C. Cir. 2007) (noting that district court correctly concluded that three

incidents identified by plaintiff, including that she "was singled out for a requirement to provide

inordinate amounts of medical information to support requests for leave," were insufficient to

support a hostile work environment claim); *cf. Hussain*, 435 F.3d at 366 (although plaintiff

described a work environment that was "hardly ideal," no reasonable jury could find it "abusive"

under the applicable standard).

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment will be granted, and

plaintiff's complaint will be dismissed with prejudice.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: August 15, 2007